**Mary Kathryn BROWN, Appellant**

v.

**CITY OF PITTSBURGH; Pittsburgh City Council; Luke Ravenstahl, in his official capacity as Mayor of the City of Pittsburgh.**

No. 08–1819.

United States Court of Appeals, Third Circuit.

Argued Jan. 29, 2009.

Filed: Oct. 30, 2009.

David A. Cortman, Esquire (Argued), Joshua B. Bolinger, Esquire, Alliance Defense Fund, Lawrenceville, GA, Benjamin W. Bull, Esquire, Jeremy D. Tedesco, Esquire, Alliance Defense Fund, Scottsdale, AZ, Lawrence G. Paladin, Jr., Esquire, Pittsburgh, PA, for Appellant.

Yvonne S. Hilton, Esquire (Argued), Michael E. Kennedy, Esquire, George R. Specter, Esquire, City of Pittsburgh Law Department, Pittsburgh, PA, for Appellees.

Steven W. Fitschen, Esquire, The National Legal Foundation, Virginia Beach, VA, for Amicus Curiae–Appellant, The National Legal Foundation.

Before: SCIRICA, Chief Judge, AMBRO and SMITH, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Chief Judge.

This case requires us to delineate, in a quite literal sense, the boundaries of the First Amendment's protection of speech. In response to concerns about aggressive protests and confrontations at health care facilities providing abortions, the City of Pittsburgh enacted Ordinance No. 49 in December 2005. Pittsburgh, Pa., Code tit. 6, §§ 623.01–623.07. The Ordinance established two different kinds of zones around hospitals, medical offices, and clinics. Within the "buffer zone," which extends "fifteen feet (15') from any entrance to the hospital and or [sic] health care facility," "[n]o person or persons shall knowingly congregate, patrol, picket or demonstrate." § 623.04. The "bubble zone" encompasses "the public way or sidewalk area within a radius of one hundred feet (100') from any entrance door to a hospital and/or medical office/clinic." § 623.03. Within this one-hundred-foot zone, "[n]o person shall knowingly approach another person within eight feet (8') of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person." *Id.*

Plaintiff Mary Kathryn Brown brought suit against the City[1] under 42 U.S.C. § 1983, contending the Ordinance violated the United States and Pennsylvania constitutions, as well as a Pennsylvania statute. She also moved for a preliminary injunction preventing the City from enforcing the Ordinance against her. The District Court denied the motion, finding the Ordinance facially valid and that Brown had failed to show that the City had applied— or would apply—it in an unlawful manner. Relying on its reasoning in the opinion denying the preliminary injunction, the District Court also dismissed several counts of Brown's Complaint. Brown ap-

---

1. For convenience, we use the term "the City" to refer collectively to Defendants the City of Pittsburgh, the Pittsburgh City Coun- cil, and Luke Ravenstahl, in his official capacity as Mayor of Pittsburgh.

peals from both orders. We will reverse in part, vacate in part, dismiss in part, and remand for further proceedings consistent with this opinion.

## I.

As the Ordinance itself attests, the Pittsburgh City Council sought to balance two important competing interests, "ensur[ing] that patients have unimpeded access to medical services while ensuring that the First Amendment rights of demonstrators to communicate their message to their intended audience is not impaired." Pittsburgh, Pa., Code tit. 6, § 623.01. Noting that, before the Ordinance, the Pittsburgh Police had "consistently" been required "to mediate the disputes between those seeking medical counseling and treatment and those who would counsel against their actions," the Council intended the Ordinance to establish "clear guidelines for activity in the immediate vicinity of the entrances to Health Care Facilities," in order to allow "a more efficient and wider deployment" of policing services and to "help also reduce the risk of violence and provide unobstructed access to Health Care Facilities." *Id.* During hearings on the proposed Ordinance, the Council heard public comments complaining of physical violence and verbal harassment at medical facilities providing abortions and claiming the Ordinance was needed to prevent future harm.[2]

Brown is a registered nurse who works in Pittsburgh, Pennsylvania. For more than fifteen years, she has spent countless hours engaged in "sidewalk counseling"[3] and leafletting outside three medical services facilities covered by the Ordinance, attempting to dissuade women from undergoing abortions, warning them of the procedure's ostensible dangers, and encouraging them to consider alternatives. Brown testified that she believes a conversational, sympathetic approach is the most effective, so in delivering her message, she refrains from yelling or using amplification devices. Before the Ordinance's enactment, Brown had stood alongside the facilities' entrances, or walked alongside women approaching the facilities, while attempting to distribute leaflets and engage in conversation.

Since the Ordinance took effect, Brown claims she has been effectively prevented from communicating her message. The buffer zone prevents her from distributing leaflets next to the facilities' entrances, or from engaging in any advocacy within fifteen feet of those entrances. She claims that because of the bubble zone, she must either yell at people from a distance of eight feet—often while walking backward or being forced off the sidewalk into the street—or stand still and speak to them in the one or two seconds it takes them to

---

2. Brown contends the District Court erred in taking judicial notice of the minutes from the City Council's public meetings, noting that other witnesses "testified that no violent altercations occur at these facilities." She does not, however, challenge the authenticity of the minutes themselves. We refer to the minutes here as part of the familiar process of consulting legislative history in order to illuminate legislative intent. We do not draw any conclusions about the truth of the testimony heard by the City Council, but note only that certain testimony asserting the need to protect public safety and preserve policing re-

sources is consistent with the purposes stated in the text of the Ordinance itself.

3. According to Brown's testimony, her "sidewalk counseling" consists of offering literature to women entering the medical facilities and telling them "[t]hat the [abortion] procedure itself is dangerous. That there is help available. That we're here to help [them]. That any reason [they] need[ ] to get an abortion, that we have help and solutions to all those problems that [cause them to] feel[ ] the need to do this."

walk by.[4] According to Brown, women have not taken a single leaflet from her since the bubble zone foreclosed her ability to approach or walk alongside them.

Brown has never been arrested for violating the Ordinance. On two occasions police officers warned her to abide by its terms. The details of the first encounter are disputed by the parties, but Brown claims the police officer manifested an intent to enforce the Ordinance selectively, applying its restrictions to her anti-abortion expression but not her anti-pornography advocacy. Brown cannot identify the officer involved in the second incident but asserts he enforced the Ordinance against her while ignoring a clinic worker who had allegedly engaged in prohibited conduct. Brown also recounts other incidents in which clinic escorts, who assist women entering the facilities, have allegedly violated the Ordinance by engaging in forbidden activities within the fifteen-foot buffer zone and approaching well within eight feet of Brown in the bubble zone, without obtaining her consent, to denounce her pro-life message. Brown asserts that in none of these cases did the police enforce the Ordinance against the escorts.

In her Complaint, Brown claims the Ordinance violates rights guaranteed her by the U.S. and Pennsylvania Constitutions—specifically, the right to free speech and freedom of the press (pertinent to the distribution of pamphlets), U.S. Const. amend. I; Pa. Const. art. I, § 7, the right to due process, U.S. Const. amend. XIV; Pa. Const. art. I, § 26, the right to equal protection, U.S. Const. amend. XIV; Pa. Const. art. I, § 26, and the right to religious freedom, U.S. Const. amend. I; Pa. Const. art. I, § 3—as well as by Pennsylvania's Religious Freedom Protection Act, 71 Pa. Stat. Ann. §§ 2401–2407. Although the Complaint attacks the Ordinance facially and as applied, Brown's preliminary injunction motion was grounded only on the as-applied challenge. Nevertheless, in the course of denying her motion, the District Court ruled the Ordinance facially valid. At oral argument on appeal, Brown's counsel explained that because both parties had had an opportunity to brief the facial challenge fully on appeal, Brown was content for us to decide that issue.[5]

## II.

### A.

■ We generally review a district court's denial of a preliminary injunction for abuse of discretion but review the underlying factual findings for clear error and examine legal conclusions de novo.[6] *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,* 511 F.3d 350, 357 (3d Cir.2007). Where, as here, "First Amendment rights are at issue," we have modified that standard. *Child Evangelism Fellowship of N.J. v. Stafford Twp. Sch. Dist.,* 386 F.3d 514, 524 (3d Cir.2004). "Although we normally will not disturb the factual findings supporting the disposition of a preliminary injunction motion in the

---

4. Under the terms of the bubble zone, persons may not approach within eight feet of others in order to demonstrate or otherwise engage in advocacy. As long as persons within the bubble zone remain stationary, however, they are free to advocate, even if their intended audience approaches within eight feet of them.

5. Our review of Brown's motion for a preliminary injunction extends only to the arguments she presses on appeal, which do not include all claims raised in her Complaint.

6. The District Court exercised jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction to review the order denying a preliminary injunction under 28 U.S.C. § 1292(a)(1).

absence of clear error, we have a constitutional duty to conduct an independent examination of the record as a whole when a case presents a First Amendment claim." *Id.*

■ We first consider Brown's facial challenge.

As a general matter this court "will not invalidate a statute on its face simply because it *may* be applied unconstitutionally, but only if it *cannot* be applied consistently with the Constitution." ... Thus, plaintiff['s] facial challenge will succeed only if [the statute in question] "is unconstitutional in every conceivable application, or ... it seeks to prohibit such a broad range of protected conduct that it is constitutionally 'overbroad.'"

*Hohe v. Casey,* 956 F.2d 399, 404 (3d Cir. 1992) (quoting *Robinson v. New Jersey,* 806 F.2d 442, 446 (3d Cir.1986); *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 796, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)); *accord McGuire v. Reilly (McGuire I),* 260 F.3d 36, 47 (1st Cir.2001). This standard is consistent with the Supreme Court's declaration in *United States v. Salerno* that a successful facial challenge requires the challenger to "establish that no set of circumstances exists under which the Act would be valid." 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). More recently, the Court has suggested that the bar may be slightly lower. *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008). Nonetheless, even under the *Washington State Grange* formulation, "a facial challenge must fail where the statute has a plainly legitimate sweep." *Id.* (internal quotation marks omitted); *see McCullen v. Coakley,* 571 F.3d 167, 174 (1st Cir.2009) ("Howsoever worded, this standard imposes a very heavy burden on a party who mounts a facial challenge to a state statute.").

**1.**

This case implicates fundamental First Amendment interests. "[T]he public sidewalks, streets, and ways affected" by the Ordinance "are 'quintessential' public forums for free speech." *Hill v. Colorado,* 530 U.S. 703, 715, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). The activities regulated by the Ordinance—"leafletting, sign displays, and oral communication"—are indisputably protected forms of expression, and "although there is debate about the magnitude of the statutory impediment to" Brown's "ability to communicate effectively with persons in the regulated zones, that ability, particularly the ability to distribute leaflets, is unquestionably lessened by this statute." *Id.* Nonetheless, "[i]t has been clear since [the Supreme] Court's earliest decisions concerning the freedom of speech that the state may sometimes curtail speech when necessary to advance a significant and legitimate state interest." *Taxpayers for Vincent,* 466 U.S. at 804, 104 S.Ct. 2118; *see McGuire I,* 260 F.3d at 42 ("Notwithstanding its exalted position in the pantheon of fundamental freedoms, free speech always must be balanced against the state's responsibility to preserve and protect other important rights."). The Ordinance here advances a number of significant government interests, including "protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy" and "ensuring the public safety and order." *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 767–68, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994); *see Hill,* 530 U.S. at 715, 120 S.Ct. 2480 ("It is a traditional exercise of the States' police powers to protect the health and safety of their citizens. That interest may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with con-

frontational protests." (internal quotation marks and citation omitted)).[7]

Reconciling these competing values, even on the level of abstract principle, is no easy task. Having to operationalize First Amendment doctrine in terms of metes and bounds, as we are compelled to do here, only increases the difficulty. If a restrictive zone of some kind is constitutionally permissible, how large may that zone be, and what kind of restrictions may it impose? As we confront these perplexing issues, we are mindful that we do not write on a blank slate. Several Supreme Court decisions, which examined zones very similar to the ones at issue here, control our analysis to a great extent. *Hill,* 530 U.S. 703, 120 S.Ct. 2480; *Schenck v. Pro–Choice Network of W.N.Y.,* 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997); *Madsen,* 512 U.S. 753, 114 S.Ct. 2516.

### The One–Hundred–Foot Bubble Zone

■ As the District Court recognized, the bubble zone defined by the Ordinance is virtually identical to the one in the Colorado statute *Hill* found facially valid.[8] *Brown v. City of Pittsburgh,* 543 F.Supp.2d 448, 471–72 (W.D.Pa.2008) (jux-taposing relevant provisions). *Compare* Pittsburgh, Pa., Code tit. 6, § 623.03, *with* Colo.Rev.Stat. § 18–9–122(3).[9] At oral argument, Brown's counsel conceded that, under *Hill,* § 623.03's bubble zone, taken alone, is constitutional on its face. We agree that § 623.03's bubble zone is materially indistinguishable from the one upheld in *Hill.*

The petitioners in *Hill* put forward several different arguments contesting the statute's constitutionality, but the Supreme Court found none of them convincing. The Court rejected the contention that the bubble zone's restrictions are content-based, observing that " '[t]he principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.' " *Hill,* 530 U.S. at 719, 120 S.Ct. 2480 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)); *see id.* at 737, 120 S.Ct. 2480 (Souter, J., concurring) ("[A] restriction is content based only if it is imposed because of the content of the speech, and not because of offensive be-

---

7. Whether the City's stated goal of "a more efficient ... deployment" of policing resources should also be deemed a significant interest is a more difficult issue. Although the state has an undeniable interest in conserving finite resources, "[t]he government cannot restrict the speech of the public at large just in the name of efficiency." *Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion); *see Bd. of County Comm'rs v. Umbehr,* 518 U.S. 668, 676, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (noting that although "the government's interest in achieving its goals as effectively and efficiently as possible" is "significant ... when it acts as employer," this interest is "relatively subordinate ... when [the government] acts as sovereign" (quoting *Waters,* 511 U.S. at 675, 114 S.Ct. 1878)). Nonetheless, we assume, without deciding, that the City's interest in the efficient use of policing resources is significant, as this issue does not affect our conclusion. *See infra* note 20.

8. "Because the statute had not actually been enforced against" the *Hill* petitioners, "they only raised a facial challenge." *Hill,* 530 U.S. at 710, 120 S.Ct. 2480.

9. The Colorado statute provides in pertinent part: "No person shall knowingly approach another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way or sidewalk area within a radius of one hundred feet from any entrance door to a health care facility." Colo.Rev.Stat. § 18–9–122(3).

havior identified with its delivery." (internal citation omitted)). The Colorado statute in *Hill* evinces no such invidious intent because its goals of protecting access to medical facilities and providing clear guidelines to police are "unrelated to the content of the demonstrators' speech," its "restrictions apply equally to all demonstrators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech." *Id.* at 719, 720, 120 S.Ct. 2480 (majority opinion) (internal quotation marks omitted). Nor is the statute content-based because it restricts knowingly approaching another for purposes of "oral protest, education, or counseling," while imposing no limits on casual conversation—for example, saying "good morning." This distinction serves not to suppress certain disapproved ideas, which would be presumptively invalid, but instead to further legitimate, content-neutral goals:

> [T]he statute's restriction seeks to protect those who enter a health care facility from the harassment, the nuisance, the persistent importuning, the following, the dogging, and the implied threat of physical touching that can accompany an unwelcome approach within eight feet of a patient by a person wishing to argue vociferously face-to-face and perhaps thrust an undesired handbill upon her. The statutory phrases, "oral protest, education, or counseling," distinguish speech activities likely to have those consequences from speech activities ... that are most unlikely to have those consequences.

*Id.* at 724, 120 S.Ct. 2480; *see also McGuire I,* 260 F.3d at 44 ("As long as a regulation serves a legitimate purpose unrelated to expressive content, it is deemed content-neutral even if it has an incidental effect on some speakers and not others."). In short, "[t]he purpose of the Colorado statute is not to protect a potential listener from hearing a particular message. It is to protect those who seek medical treatment from the potential physical and emotional harm suffered when an unwelcome individual delivers a message (whatever its content) by physically approaching an individual at close range, *i.e.*, within eight feet." *Hill,* 530 U.S. at 718 n. 25, 120 S.Ct. 2480.

The *Hill* Court also noted that the Colorado bubble zone is "not a regulation of speech" per se, but rather "a regulation of the places where some speech may occur." *Id.* at 719, 120 S.Ct. 2480. That is, the bubble zone "does not entirely foreclose any means of communication." *Id.* at 726, 120 S.Ct. 2480. It does not prohibit any message, whether expressed orally or by sign or leaflet, but simply imposes an eight-foot separation between the speaker and the audience (absent consent to approach closer). As such, the validity of the regulation is determined by reference to the Court's time, place, and manner doctrine. Under that doctrine, "a regulation of the time, place, or manner of protected speech" is constitutionally permissible if it is "narrowly tailored to serve the government's legitimate, content-neutral interests," *Ward,* 491 U.S. at 798, 109 S.Ct. 2746, and "leave[s] open ample alternative channels for communication," *id.* at 791, 109 S.Ct. 2746 (internal quotation marks omitted). When a time, place, and manner regulation takes the form of a generally applicable statute, it "may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill,* 530 U.S. at 726, 120 S.Ct. 2480; *see Madsen,* 512 U.S. at 765, 114 S.Ct. 2516 (contrasting this standard with the more stringent scrutiny applicable to a challenged injunction, which is valid only if it "burden[s] no more speech than necessary

to serve a significant government interest").

Having concluded that the statute is content-neutral, the Court found that its restrictions on speech are sufficiently tailored to its legitimate objectives and leave open ample alternative avenues of communication. *Hill*, 530 U.S. at 726, 120 S.Ct. 2480. The enforcement of an eight-foot barrier is a constitutionally tolerable burden on expression because "signs, pictures, and voice itself can cross an 8–foot gap with ease." *Id.* at 729, 120 S.Ct. 2480. The Court acknowledged that "[t]he burden on the ability to distribute handbills is more serious because it seems possible that an 8–foot interval could hinder the ability of a leafletter to deliver handbills to some unwilling recipients." *Id.* at 727, 120 S.Ct. 2480. But noting that the statute did not "prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians can easily accept," the Court found the regulation did not impose an excessive restraint. *Id.* In support of this conclusion, the Court referred to its earlier decision in *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), where it had upheld a regulation restricting the distribution of literature to fair booths. *Heffron* emphasized that the fair-booth restriction "primarily burdened the distributors' ability to communicate with unwilling readers" and afforded an adequate opportunity "to win the[ ] attention" of willing listeners. *Hill*, 530 U.S. at 728, 120 S.Ct. 2480 (quoting *Kovacs v. Cooper*, 336 U.S. 77, 87, 69 S.Ct. 448, 93 L.Ed. 513 (1949)). The bubble zone established by the Colorado statute (and the Pittsburgh Ordinance) impairs primarily the effort to communicate with unwilling listeners, and by allowing leafletters significant mobility, it "interferes far less" with communication than the state-

fair regulation upheld in *Heffron*. *Id.* at 730, 120 S.Ct. 2480. In sum, in light of the state's "substantial and legitimate interest" in protecting those attempting to enter health care facilities, who "are often in particularly vulnerable physical and emotional conditions," the Court found the Colorado bubble zone to be "an exceedingly modest restriction on the speakers' ability to approach." *Id.* at 729, 120 S.Ct. 2480.

The Court was unmoved by petitioners' argument that the state could achieve its objectives through less restrictive means. As noted above, a content-neutral time, place, and manner restriction embodied in a generally applicable regulation need not be "the least restrictive or least intrusive means of serving the statutory goal." *Id.* at 726, 120 S.Ct. 2480. "[W]hether or not the 8–foot interval is the best possible accommodation of the competing interests at stake," the Court believed it was obliged to "accord a measure of deference to the judgment of the Colorado Legislature." *Id.* at 727, 120 S.Ct. 2480. The Court rejected the view, advanced by Justice Kennedy in his dissent, *id.* at 777–78, 120 S.Ct. 2480 (Kennedy, J., dissenting), that the state interests at stake could be adequately served—with less restriction of protected speech—by enforcing pre-existing prohibitions on battery and harassment. The Court recognized that the statute's "prophylactic approach" to "protect[ing] those who wish to enter health care facilities ... will sometimes inhibit a demonstrator whose approach in fact would have proved harmless." *Id.* at 729, 120 S.Ct. 2480 (majority opinion). But it found the bubble-zone approach to be "justified by the great difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as ha-

rassing or not harassing) of each individual movement within the 8–foot boundary." *Id.* In light of the difficulties inherent in making the individualized, case-by-case judgments necessary to enforce a battery or harassment law, the Court concluded that "[a] bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself." *Id.*

In sum, the *Hill* Court upheld the Colorado statute, finding it to be a content-neutral time, place, and manner regulation that was narrowly tailored to serve significant government interests while leaving open ample alternative avenues of speech.[10] As the bubble zone created by the Ordinance at issue here is a virtually verbatim copy of the *Hill* statute, we find this portion of the Ordinance, taken alone, to be facially valid under the First Amendment's Free Speech Clause.

### *The Fifteen–Foot Buffer Zone*

■ Although Brown concedes that the one-hundred-foot bubble zone is, taken on its own, constitutionally valid, she contends the fifteen-foot buffer zone cannot withstand constitutional scrutiny. In *Madsen* and *Schenck,* the Supreme Court upheld buffer zones (established by injunctions) requiring protesters to remain at least thirty-six feet and fifteen feet, respectively, from clinic entrances.[11] Brown asserts, however, that the Ordinance's buffer zone is content-based, unlike the content-neutral zones in *Madsen* and *Schenck. Cf. Madsen,* 512 U.S. at 762–64, 114 S.Ct. 2516. The Ordinance provides that "[n]o person or persons shall knowingly congregate, patrol, picket or demonstrate" within fifteen feet of an entrance to a hospital or health care facility. Pittsburgh, Pa., Code tit. 6, § 623.04. But it explicitly exempts certain persons from the buffer zone's restrictions: "This section shall not apply to police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office, or clinic engaged in assisting

---

**10.** The petitioners in *Hill* also contended that the statute was unconstitutionally overbroad, arguing that "it protects too many people in too many places, rather than just the patients at the facilities where confrontational speech had occurred," and that "it burdens all speakers, rather than just persons with a history of bad conduct." *Hill,* 530 U.S. at 730, 120 S.Ct. 2480. The Court disagreed, finding that the petitioners' argument did "not identify a constitutional defect." *Id.* Because the regulation took the form of a generally applicable statute, rather than an injunction, it could not discriminate among individuals based on their past conduct. Furthermore, the Court believed "the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive." *Id.* at 731, 120 S.Ct. 2480.

More fundamentally, the petitioners' argument reflected a basic misunderstanding of overbreadth doctrine. In the Court's seminal overbreadth cases, "the government attempted to regulate nonprotected activity, yet because the statute was overbroad, protected speech was also implicated." *Id.* (citing *Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *Sec'y of State v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984)). In *Hill,* by contrast, "it is not disputed that the regulation affects protected speech activity; the question is thus whether it is a 'reasonable restrictio[n] on the time, place, or manner of protected speech.'" *Id.* (quoting *Ward,* 491 U.S. at 791, 109 S.Ct. 2746). What the petitioners classified as an "overbreadth" problem, in other words, was better understood analytically as a concern to be addressed within the framework of *Ward's* narrow-tailoring test.

**11.** The buffer zone upheld in *Madsen* extended not only thirty-six feet from the clinic's entrance, but also thirty-six feet from its driveway.

patients and other persons to enter or exit the hospital, medical office, or clinic." *Id.* It is this exemption, Brown contends, that makes the Ordinance content-based on its face.[12]

The City does not deny that the buffer zone's restrictions would be content-based if the Ordinance allowed the exempted categories of persons (including, most notably, volunteers assisting women in entering the building) to "picket or demonstrate" within the fifteen-foot zone while denying all others the same ability. But the City insists that the exemption should not be interpreted in such a manner, arguing that "[t]he Ordinance's exemption for authorized clinic volunteers in the 15' fixed buffer zone is limited to circumstances where the volunteers are actually 'engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic.'" According to the City, the exemption allows the volunteers to enter the buffer zone only for this non-content-related purpose; notwithstanding the exemption, no person in the buffer zone may engage in "demonstrations or oral protest, education, or counseling with other individuals, including patients or other protesters." *Id.* at 20.

When considering a facial challenge to a state law, "a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *see Ward,* 491 U.S. at 795–96, 109 S.Ct. 2746. Here, the parties have identified no such limiting construction other than the one offered by the City in this litigation, and we have found none. *Cf. McGuire v. Reilly (McGuire II),* 386 F.3d 45, 52 (1st Cir.2004) (noting that the Massachusetts Attorney General had set forth a limiting interpretation of the statute at issue in a letter sent to police departments). In the absence of a limiting construction from a state authority, we must "presume any narrowing construction or practice to which the law is fairly susceptible." *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 770 n. 11, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (internal quotation marks omitted); *see also INS v. St. Cyr,* 533 U.S. 289, 299–300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." (quoting *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932))); *Davet v. City of Cleveland,* 456 F.3d 549, 554 (6th Cir.2006) ("[F]ederal courts construe state statutes to avoid constitutional difficulty when fairly possible ...." (internal quotation marks omitted)).[13]

---

**12.** A content-based regulation of speech is subject to strict scrutiny, a more exacting level of review than was applied to the regulations in *Madsen, Schenck,* or *Hill. See ACLU v. Mukasey,* 534 F.3d 181, 190 (3d Cir.2008) (citing *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

**13.** This principle of interpretation is consistent with Pennsylvania law. *See Commonwealth v. Monumental Props., Inc.,* 459 Pa. 450, 329 A.2d 812, 827 (1974) ("When the validity of an act of the [Legislature] is drawn in question, and if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided." (internal quotation marks omitted) (alterations in original)); *Dole v. City of Phila.,* 337 Pa. 375, 11 A.2d 163, 168–69 (1940) (applying the same principle to the construction of ordinances).

We find § 623.04 amenable to the content-neutral construction urged by the City, that is, an interpretation prohibiting even the exempted classes of persons from "picket[ing] or demonstrat[ing]" within the buffer zone. Each of the exempted classes of persons—"police and public safety officers, fire and rescue personnel, . . . other emergency workers[,] . . . authorized security personnel employees [and] agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit"—performs important safety functions. The clear purpose of the exemption is to ensure that the Ordinance's restrictions do not impair the performance of those functions. Accordingly, public safety officers and emergency workers are exempt only "in the course of their official business," and security personnel employees or agents of the health care facility are exempt only insofar as they are "engaged in assisting patients and other

persons to enter and exit" the facility. The functions performed by these persons are likely to require their presence in the buffer zone, thus warranting an exemption from § 623.04's general prohibitions on congregating or patrolling within that space. But these functions do not require or entail the picketing or demonstrating activities generally proscribed by the buffer-zone restriction.[14] Consequently, a construction that does not include these advocacy activities in the exemption is "fairly possible." *St. Cyr*, 533 U.S. at 300, 121 S.Ct. 2271. Such a reading may, in fact, be the best way to give effect to the previously quoted phrases limiting the exemption to the performance of particular functions. Having determined that § 623.04 is susceptible to a construction that avoids serious constitutional concerns, we adopt that construction and hence find the buffer-zone provision facially content neutral.[15]

14. The effective performance of these functions may require other kinds of speech, as when police officers issue instructions to abide by the law and clinic employees or volunteers help direct patients in and out of the facilities. But this speech cannot be classified as picketing or demonstrating and does not fall within the scope of § 623.04's general prohibitions.

15. In *McGuire I*, the United States Court of Appeals for the First Circuit confronted an exemption similar to the one in § 623.04. The *McGuire* statute prohibited "knowingly approach[ing] another person or occupied motor vehicle within six feet of such person or vehicle," without consent, "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way or sidewalk area within a radius of 18 feet from any entrance door . . . to a reproductive health care facility." *McGuire I*, 260 F.3d at 51. Like § 623.04, the *McGuire* statute exempted from the zone's restrictions several classes of persons, including "employees or agents of such facility acting within the scope of their employment" and "law enforcement, ambulance, firefighting, construc-

tion, utilities, public works and other municipal agents acting within the scope of their employment." *Id.* The district court in *McGuire* had found that this exemption constituted viewpoint-based discrimination, allowing employees and agents of the facility to engage in unfettered (presumably pro-choice) protest and counseling while restricting the pro-life message of the plaintiffs. The court of appeals disagreed. Rather than invoking the canon of constitutional avoidance, as we have done, the court relied on a different ground:

The Massachusetts legislature may or may not have intended the employee exemption to serve the purpose envisioned by the plaintiffs [and the district court]. There are other likely explanations. For example, the legislature may have exempted clinic workers—just as it exempted police officers—in order to make crystal clear what already was implicit in the Act: that those who work to secure peaceful access to [health care facilities] need not fear prosecution. *Id.* at 47. In the context of a facial challenge, the court explained, the question is whether the exemption "may rationally be said" to serve at least one permissible, viewpoint- and

276

As a content-neutral time, place, and manner regulation, the buffer zone is constitutionally valid if it is narrowly tailored to serve the government's significant interests and leaves open ample alternative channels of communication. *See Hill,* 530 U.S. at 725–26, 120 S.Ct. 2480. The zone may be "narrowly tailored" even if it is not "the least restrictive or least intrusive means" of serving those interests. *Id.* at 726 n. 32, 120 S.Ct. 2480 (quoting *Ward,* 491 U.S. at 798, 109 S.Ct. 2746). In *Madsen* and *Schenck,* the Supreme Court upheld buffer zones extending thirty-six and fifteen feet, respectively, from clinic entrances. As noted, because those buffer zones were established by injunctions rather than generally applicable legislation, they were subject to a more demanding standard of review: the Court asked "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen,* 512 U.S. at 765, 114 S.Ct. 2516; *see McCullen,* 571 F.3d at 178–79 (distinguishing the tailoring test applicable to generally applicable regulations from the test applicable to injunctions). The government interests at stake here are significant and largely overlap with those recognized in *Madsen* and *Schenck.* Accordingly, since the Court upheld the buffer zones in *Madsen* and *Schenck* (one of which was more than twice as large as the buffer zone here), finding them sufficiently tailored under a test more exacting than the one applicable here, the buffer zone established by the

Ordinance is *a fortiori* constitutionally valid. This conclusion is bolstered by the First Circuit's recent decision in *McCullen v. Coakley,* which rejected a facial challenge to a Massachusetts statute establishing 35–foot buffer zones—more than twice the size of the Ordinance's buffer zones here—around the entrances and driveways of reproductive health care facilities. *See* An Act Relative to Public Safety at Reproductive Health Care Facilities, Mass. Gen. Laws ch. 266, § 120E1/2. The court found that the statute was "content-neutral, narrowly tailored, and l[eft] open ample alternative channels of communication." *McCullen,* 571 F.3d at 184.

### The Combination of the Two Zones

The Ordinance creates not a single bubble or buffer zone in isolation, but a combination of the two types of zones. *Schenck* upheld a fixed buffer zone while invalidating the bubble-zone portion of an injunction. *Schenck,* 519 U.S. at 377–78, 117 S.Ct. 855. But as the *Hill* Court later explained, the constitutional defect in the *Schenck* bubble zone lay in its specific attributes; it imposed a fifteen-foot separation between speaker and listener and otherwise represented an excessive burden on speech. *Hill,* 530 U.S. at 726–27, 120 S.Ct. 2480. By contrast, *Hill* upheld a bubble zone that, like the one here, imposed a shorter, eight-foot separation, allowed the speaker to remain stationary even if passersby approached within eight feet, and protected speakers by incorporat-

content-neutral purpose. *Id.; accord McGuire II,* 386 F.3d at 58. The *McGuire* court believed the exemption was plausibly intended to clarify that the statute does not prohibit certain classes of persons from entering and remaining in the buffer zone in order to perform tasks unrelated to advocacy. "Because we can envision at least one legitimate reason for including the employee exemption in the Act," the court concluded, "it would be

premature to declare the Act unconstitutional for all purposes and in all applications." *McGuire I,* 260 F.3d at 47. The court noted that, to the extent "experience shows that clinic staffers [and volunteers] in fact are utilizing the exemption as a means either of proselytizing or of engaging in preferential pro-choice advocacy, the plaintiffs remain free to challenge the Act, as applied, in a concrete factual setting." *Id.*

ing a scienter requirement. *Id.; see id.* at 740, 120 S.Ct. 2480 (Souter, J., concurring) ("In *Schenck,* the floating bubble was larger (15 feet) and was associated with near-absolute prohibitions on speech."). In other words, although *Schenck* informs our constitutional analysis (along with *Madsen* and *Hill),* its different facts mean we cannot simply adopt its conclusion, but must instead examine the specific features of the two zones combined here.

If the Ordinance's bubble and buffer zones, taken individually, are facially content-neutral, we see no reason why the Ordinance's combination of the two zones would not also be content-neutral on its face. Accordingly, the test of constitutional validity is again found in *Ward:* a content-neutral time, place, and manner regulation of protected speech must be "narrowly tailored to serve a significant governmental interest, and [must] leave open ample alternative channels for communication of the information." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746. Because we have already determined that the Ordinance serves significant government interests, the key remaining considerations are the "narrowly tailored" and "alternative channels for communication" requirements. In *Ward,* the Supreme Court made clear that the "narrowly tailored" standard affords the government some discretion in deciding how best to achieve its legitimate purposes. *See also Hill,* 530 U.S. at 727, 120 S.Ct. 2480 ("[W]hether or not the 8–foot interval is the best possible accommodation of the competing interests at stake, we must accord a measure of deference to the judgment of the Colorado Legislature."). As noted, a content-neutral time, place, and manner regulation may be sufficiently tailored even if it is not "the least restrictive or least intrusive means of serving the government interests at stake." *Ward,* 491 U.S. at 798, 109 S.Ct. 2746; *see Hill,* 530 U.S. at 736, 120

S.Ct. 2480 (Souter, J., concurring) ("[O]ur cases quite clearly hold that restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985))). "[T]he requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward,* 491 U.S. at 799, 109 S.Ct. 2746 (quoting *Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897 (1985)); *see id.* at 800, 109 S.Ct. 2746 (explaining that courts may not second-guess the government's decision "concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted" (internal quotation marks omitted)). But the First Amendment necessarily circumscribes the government's discretion; a restriction is not "narrowly tailored" simply because it efficaciously serves a significant government interest. "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.; see Casey v. City of Newport,* 308 F.3d 106, 112 & n. 4 (1st Cir.2002). Accordingly, a content-neutral time, place, or manner regulation will be found to be "narrowly tailored" even if "a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative," "[s]o long as the means chosen are not substantially broader than necessary to achieve [that] interest." *Ward,* 491 U.S. at 800, 109 S.Ct. 2746. Our task is to apply this test to the scheme of speech-restrictive zones established by the Ordinance, using the

Court's decisions in *Madsen, Schenck,* and *Hill* as guideposts.

"The burden is on the City to demonstrate the constitutionality of its actions." *Startzell v. City of Phila.,* 533 F.3d 183, 201 (3d Cir.2008). Here, the City argues that the Ordinance's combination of the buffer and bubble zones is narrowly tailored because the two zones are complementary; each serves a different significant interest. The bubble zone "creates a small safety dome," around entering clinic patients so as to serve the government interest of preventing "persistent, importunity, following and dogging," *Hill,* 530 U.S. at 718, 120 S.Ct. 2480. "Because no protester is required to move out of the path of an approaching person" under the bubble zone restrictions, the City maintains that the "15′ buffer zone is likewise necessary to ensure unimpeded access to and from clinics." The buffer zone also "allows the police to have a bright-line test for enforcement to keep doorways open." *Id.* In short, the City believes the Ordinance falls within the ambit of discretion afforded by *Ward.*

Brown contends that the Ordinance's restrictions are not sufficiently tailored to the interests they serve.[16] In particular, Brown notes that the Colorado statute upheld in *Hill* did not contain a buffer zone in addition to the one-hundred-foot bubble zone. Rather than take a prophylactic approach to blocked entrances, the statute directly proscribed the offending behavior, making it unlawful to knowingly "obstruct[ ], detain[ ], hinder[ ], impede[ ], or block[ ] another person's entry to or exit from a health care facility." *Hill,* 530 U.S. at 708 n. 1, 120 S.Ct. 2480 (quoting Colo Rev. Stat. § 18–9–122(2)). In Brown's

view, "[t]his language exemplifies narrow tailoring," whereas the Ordinance's addition of the buffer zone excessively burdens speech by precluding any advocacy activities within a fifteen-foot radius of the clinic entrance irrespective of whether those activities actually impede patient access.

Brown asserts that the addition of the buffer zone has an especially onerous effect on leafletting. In *Hill,* the Supreme Court expressed a similar concern. Although it found that the eight-foot separation imposed by the bubble zone would not necessarily present a significant obstacle to the display of signs and oral communication, *Hill,* 530 U.S. at 726–27, 729, 120 S.Ct. 2480, the Court recognized that "[t]he burden on the ability to distribute handbills is more serious because it seems possible that an 8–foot interval could hinder the ability of a leafletter to deliver handbills to some unwilling recipients." *Id.* at 727, 120 S.Ct. 2480. In nonetheless finding the Colorado statute constitutional, the *Hill* Court noted approvingly that the bubble zone allowed leafletters to stand stationary in the path of oncoming pedestrians. *Id.* at 727–28, 120 S.Ct. 2480. The Court also observed that "demonstrators with leaflets might easily stand on the sidewalk at entrances (without blocking the entrance) and, without physically approaching those who are entering the clinic, peacefully hand them leaflets as they pass by." *Id.* at 729–30, 120 S.Ct. 2480. The Court acknowledged that "[s]pecial problems ... may arise where clinics have particularly wide entrances" but determined that these problems were not the appropriate subject of a facial challenge; instead, they "may be worked out as the statute is applied." *Id.* at 730, 120 S.Ct.

---

**16.** Brown incorrectly assumes that the Ordinance's restrictions are content-based, and thus that they must satisfy a standard of strict scrutiny. Nonetheless, her arguments about the speech-restrictive effects of the Ordinance can also be measured against the tailoring requirement set forth as part of *Ward's* intermediate-scrutiny standard.

2480. Because the Ordinance here, unlike the Colorado statute, establishes a fifteen-foot buffer zone around clinic entrances, leafletters cannot stand directly next to the entrance door to ensure arm's-length access to all entering patients. In this sense, the Ordinance's buffer zone is analogous to placing very wide entrances on all of the health care facilities covered by the Ordinance. This case therefore appears to present in the context of a facial challenge the problem identified but left unresolved by *Hill*. According to Brown, the addition of the buffer zone effectively forecloses her ability to leaflet, rendering the Ordinance unconstitutional on its face.

The question is close, but we think Brown has the better argument. Although the Ordinance serves important government interests, we believe the layering of two types of prophylactic measures is "substantially broader than necessary to achieve [those] interest[s]." *Ward*, 491 U.S. at 800, 109 S.Ct. 2746. The *Hill* Court allowed the prophylactic bubble zone established by the Colorado statute, even though its restrictions swept up more than the specific incidents of dogging and harassment that were the government's professed target. *Hill*, 530 U.S. at 729, 120 S.Ct. 2480. But the Ordinance's combination of two prophylactic zones here represents a restrictive step beyond the regulation approved in *Hill*. We must, therefore, apply the *Ward* test (relied on by *Hill*) for ourselves, in order to decide whether the Ordinance's prophylactic measures—which essentially superimpose *Schenck's* fifteen-foot buffer zone onto *Hill's* one-hundred-foot bubble zone— "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799, 109 S.Ct. 2746.

In determining whether the Ordinance's restrictions are sufficiently tailored to the government's interests, we find it significant that the Ordinance's use of both types of zones appears to be unprecedented among regulatory schemes upheld by courts. We have noted that generally applicable time, place, and manner regulations enacted by legislatures are entitled to more deference than injunctions fashioned by courts. *See Madsen*, 512 U.S. at 764–65, 114 S.Ct. 2516. But from the standpoint of appellate review, injunctions offer an advantage over generally applicable legislation, as it is easier to determine what is necessary to achieve a significant interest in the context of a specific case, with specific defendants alleged to have engaged in specific conduct. In upholding the fixed buffer-zone injunctions in *Madsen* and *Schenck*, for example, the Supreme Court relied on the factual findings of the district court regarding defendant protesters' behavior. "Based on this conduct," the Supreme Court determined "the District Court was entitled to conclude ... that the only way to ensure access [to the clinic] was to move *all* protesters away from the doorways." *Schenck*, 519 U.S. at 381, 117 S.Ct. 855. Moreover, "because defendants' harassment of police" in *Schenck* "hampered the ability of the police to respond quickly to a problem, a prophylactic measure was even more appropriate." *Id.* at 382, 117 S.Ct. 855. Here, by contrast, we address a combination of legislatively enacted speech-restrictive zones without support, either in the record or in case law, for the factual proposition that both zones are needed to achieve the City's legitimate interests in preventing harassment and obstruction of entrances.[17] As "[t]he burden is on the City to demonstrate the constitutionality of

17. Brown makes two arguments that attempt to define what is necessary to achieve the

government's interests in this case. First, she focuses narrowly on her own individual activ-

its actions," *Startzell,* 533 F.3d at 201, we conclude that the Ordinance burdens substantially more speech than necessary and is thus insufficiently tailored.

As demonstrated by the cases on which the City relies, either one of the two zones, standing alone, would advance the interests identified by the City. As *Hill* recognized, the one-hundred-foot bubble zone is designed especially to prevent harassment by enforcing a space of separation between protesters and unwilling listeners. But by

ity, asserting that because her advocacy in front of clinics has always been peaceful, the Ordinance "punishes [her] for phantom misconduct never committed by her." But Brown's behavior is not the relevant benchmark for a generally applicable regulation like the Ordinance. "[T]he validity of the regulation depends on the relation its bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Ward,* 491 U.S. at 801, 109 S.Ct. 2746; *see also Albertini,* 472 U.S. at 688, 105 S.Ct. 2897 ("The First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests.").

Second, with respect to the "overall problem," Brown asserts that the City has not established the existence at Pittsburgh health care facilities of harassment, dogging, or obstruction sufficient to justify the Ordinance's restrictions. The Pittsburgh City Council's public meeting minutes include comments complaining of precisely these problems. But Brown notes that other comments denied that such incidents ever occurred at the Pittsburgh clinics, and she complains that the public meeting minutes were inadmissible hearsay.

The public meeting minutes themselves are not crucial to our analysis, as we have held that "a factual basis" justifying legislation need not be "submitted to the legislative body prior to the enactment of the legislative measure." *Phillips v. Borough of Keyport,* 107 F.3d 164, 178 (3d Cir.1997) (en banc); *see id.* ("Whatever level of scrutiny we have applied in a given case, we have always found it acceptable for individual legislators to base their judgments on their own study of the subject matter of the legislation, their communications with constituents, and their own life experience and common sense so long as they come forward with the required showing in the courtroom once a challenge is raised."). In secondary effects cases such as this, where a regulation is justified on the basis of conduct that is associated with certain types of protected expression (but is not the direct result of the expression's content), courts owe deference to legislative judgments. *See McCullen,* 571 F.3d at 179 (citing *Turner Broad. Sys., Inc. v. FCC,* 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997)); *id.* at 181 (observing that the buffer-zone statute at issue was enacted to combat "the secondary effects" of protests at health care facilities). In making these judgments, legislatures may look outside of their own regional jurisdictions for evidence substantiating the problem to which a given regulation is addressed. *See Mitchell v. Comm'n on Adult Entm't Establishments of State of Del.,* 10 F.3d 123, 133 (3d Cir.1993) ("[A] city or state may rely heavily on the experience of, and studies produced by, other cities and states, as well as on court opinions from other jurisdictions.") (citing *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50–51, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)); *Phillips,* 107 F.3d at 175 ("It may well be that the defendants here, by pointing to studies from other towns and to other evidence of legislative facts, will be able to carry their burden of showing that the ordinance is reasonably designed to address the reasonably foreseeable secondary effect problems."). Here, the City relies on the Supreme Court's opinions in *Hill, Schenck,* and *Madsen,* along with the First Circuit's opinions in *McGuire I* and *McGuire II,* for evidence of a need to protect access and prevent harassment and intimidation at health care facilities. (All of these cases were also cited during the City Council's debate on the Ordinance.) Accordingly, our conception of the "overall problem" to which the Ordinance is addressed properly draws on the legislative records and other facts examined in those decisions. As we explain, however, those cases—none of which upheld a combination of bubble and buffer zones—do not support the proposition that the full extent of the Ordinance's restrictions is necessary to protect the significant interests identified by the City.

preventing persons within the zone from approaching for advocacy purposes within eight feet of those who have not signaled their consent, the bubble zone also makes it more difficult for protesters to block entrances to the clinic. *Cf. Hill*, 530 U.S. at 729, 120 S.Ct. 2480 (noting that the prophylactic bubble zone relieves police of the need to "focus exclusively on the individual impact of each instance of behavior" and to characterize "each individual movement" made by protesters).[18]

The fixed buffer zone also achieves the City's interests. Not only does it work directly to prevent obstruction, but by preventing all but the expressly authorized individuals in § 623.04's exemption from congregating anywhere within fifteen feet of a medical facility's entrance, it also serves the City's goal of preventing harassment and intimidation. At the very least, the buffer zone ensures that entering patients will not have to run a "gauntlet" of protesters, *Madsen*, 512 U.S. at 758, 114 S.Ct. 2516, in order to obtain medical services.[19]

For these reasons, the buffer zone, taken alone, promises to accomplish the City's objectives of protecting patient access and preventing harassment. On the other hand, the addition of the bubble zone imposes significant burdens on protected speech. Leafletting, a "classic form[ ] of speech that lie[s] at the heart of the First Amendment," *Schenck*, 519 U.S. at 377, 117 S.Ct. 855, is especially hard hit by the bubble zone's enforcement of a space of separation. Although the buffer zone, standing alone, would require leafletters to remain beyond arm's reach of a medical facilities' entrances, they would still be able to approach individuals outside of the fifteen-foot radius in order to distribute their literature. With the additional restrictions of the bubble zone, on the other hand, not only are leafletters forbidden from distributing literature within the buffer zone, but they may not approach within eight feet of oncoming pedestrians absent their consent anywhere within one hundred feet of health care facility entrances. As these consequences demonstrate, if the multi-zone Ordinance does not effectively foreclose leafletting entirely, it severely curtails it. In our view, the combination of the two zones burdens substantially more speech than appears necessary, on this record, to achieve the government's interests. *See Ward*, 491 U.S. at 800, 109 S.Ct. 2746.

Although the holdings in *Madsen*, *Schenck*, and *Hill* do not dispose of the particular regulatory scheme presented here, the Court's opinions in those cases support our conclusion. While upholding the thirty-six-foot buffer zone around clinic entrances, *Madsen* invalidated a provision of the injunction that would have prohibit-

---

**18.** In order to avoid running afoul of the bubble-zone restrictions, protesters might stand stationary in front of clinic entrances, but such conduct could be regulated—with less impact on expression than the buffer zone—by a law directly proscribing obstruction or blockading of entrances, such as the Colorado provision complementing the bubble-zone regulation upheld in *Hill*. *See* Colo. Rev.Stat. § 18–9–122(2) (prohibiting "knowingly obstruct[ing], detain[ing], hinder[ing], imped[ing], or block[ing] another person's entry to or exit from a health care facility").

**19.** Moreover, the relative simplicity of the buffer zone, the boundaries of which can be clearly and objectively marked on the pavement, would appear to present an easier enforcement task than that posed by the bubble zone's floating eight-foot space of separation. *Cf. McCullen v. Coakley*, 573 F.Supp.2d 382, 391–99 (D.Mass.2008) (Massachusetts replaced the bubble zone upheld in *McGuire II* with a buffer zone because enforcement of the bubble zone proved difficult and protesters blocked clinic entrances.), *aff'd*, 571 F.3d 167 (1st Cir.2009).

ed defendants "from physically approaching any person seeking services of the clinic 'unless such person indicates a desire to communicate' in an area within 300 feet of the clinic." *Madsen,* 512 U.S. at 773, 114 S.Ct. 2516. Like the bubble zone here, that zone was designed "to prevent clinic patients . . . from being 'stalked' or 'shadowed' . . . as they approached the clinic." *Id.* Nonetheless, the Court found "it is difficult, indeed, to justify a prohibition on *all* uninvited approaches of persons seeking the services of the clinic, regardless of how peaceful the contact may be, without burdening more speech than necessary to prevent intimidation and to ensure access to the clinic." *Id.* at 774, 114 S.Ct. 2516. Accordingly, the Court refused to countenance this additional layer of prophylaxis. While acknowledging the serious incidents of disorder and obstruction to which the injunction was addressed, the Court concluded the fixed buffer zone was sufficient to accomplish the government interests at stake; the addition of the no-approach zone was unconstitutionally excessive.

Similarly, in *Schenck* the Court upheld a fifteen-foot fixed buffer zone while striking down an additional bubble zone establishing a space of separation "around people entering and leaving the clinics." *Schenck,* 519 U.S. at 377, 117 S.Ct. 855. The Court again found this zone "burden[ed] more speech than is necessary to serve the relevant governmental interests," in part because it "prevent[ed] defendants . . . [from] handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks." *Id.*

And in *Hill,* which applied the more relaxed tailoring standard pertinent to generally applicable regulations such as the Ordinance, the Court indicated that the bubble zone at issue in that case might raise serious constitutional concerns if applied to a clinic with an unusually wide entrance. 530 U.S. at 730, 120 S.Ct. 2480. Here, because of the fifteen-foot fixed bubble zone, every entrance is a wide entrance as far as leafletters are concerned-indeed, at least a thirty-foot-wide entrance (assuming the fifteen-foot radius is measured from the very center of the door). We are thus unable to rely, as the *Hill* Court was, on the prospect that "demonstrators with leaflets might easily stand on the sidewalk at entrances . . . and, without physically approaching those who are entering the clinic, peacefully hand them leaflets as they pass by." *Id.* at 729–30, 120 S.Ct. 2480. With the Ordinance's multi-zone restrictions, not only are leafletters unable to stand within fifteen feet of clinic entrances, but they are constrained from moving freely even outside of that protective zone. The fifteen-foot exclusion is a prophylaxis that effectively advances the City's interests. The additional burden of the bubble zone's restrictions would be, on this record, unduly—and unconstitutionally—onerous.[20] Accordingly, we find the Ordinance's combination of the two zones to be insufficiently tailored under *Ward.*[21]

---

**20.** Although we have focused our analysis on the governmental interest in preventing harassment and obstruction of clinic entrances, we acknowledge that the City has also asserted an interest in conserving police resources. Even assuming that this interest is significant and justifies some sort of prophylactic regulation, however, the City has not demonstrated that an individual buffer or bubble zone would not adequately serve this goal. Accordingly, the City's asserted interest in policing efficiency does not alter our conclusion that the combination of the two zones is insufficiently tailored.

**21.** Brown also attacks the Ordinance as overbroad, but this argument appears to be limited to her as-applied challenge. *See infra* Section II.B.1. To the extent Brown brings a

## 2.

■ Because we have concluded that the combination of the bubble and buffer zones is invalid under the First Amendment, we consider the remaining claims in Brown's legal challenge only insofar as they might invalidate either the bubble or buffer zone on its own. Brown asserts that the same flaw that allegedly renders the Ordinance a content-based restriction on speech—the exemption from the buffer zone restrictions of certain persons, such as health care facility employees and volunteers—also violates the Equal Protection Clause. Having already rejected the argument that each of the Ordinance's

zones is facially content-based, however, we also find that each is consonant with equal protection. "[W]here the state shows a satisfactory rationale for a content-neutral time, place, and manner regulation, that regulation necessarily" survives scrutiny under the Equal Protection Clause. *McGuire I*, 260 F.3d at 49–50 (citing *Thorburn v. Austin*, 231 F.3d 1114, 1122 (8th Cir.2000); *Hoover v. Morales*, 164 F.3d 221, 227 n. 3 (5th Cir.1998); *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 411 n. 7 (6th Cir.1997)). "So it is here:" each zone of the Ordinance "passes muster under the Equal Protection Clause for the same reasons that it passes muster under the First Amendment." *Id.* at 50.[22]

facial overbreadth challenge, her attack is foreclosed by *Hill. See supra* note 10.

22. The District Court determined that "[s]ince the case at hand involves the fundamental right to engage in free speech, strict scrutiny is warranted." *Brown*, 543 F.Supp.2d at 485. Although it is true generally under the Equal Protection Clause that legislative actions are subject to strict scrutiny when they "impermissibly interfere[ ] with the exercise of a fundamental right," *id.* (quoting *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976)), this standard does not apply to content-neutral time, place, and manner restrictions valid under *Ward's* First Amendment test. Whereas strict scrutiny demands that a challenged regulation be the least restrictive means of achieving a compelling state interest, *see ACLU*, 534 F.3d at 190, *Ward's* intermediate-scrutiny standard asks whether a content-neutral time, place, and manner regulation is narrowly tailored (but not necessarily the least intrusive means) to serve a significant state interest. If every time, place, and manner regulation were subject to strict scrutiny under the Equal Protection Clause simply because it burdened constitutionally protected speech, *Ward's* intermediate-scrutiny test would be rendered obsolete. Instead, it is only content-based time, place, and manner regulations that call for strict scrutiny—whether viewed through the lens of First Amendment or Equal Protection doctrine. *See McCullen*, 571 F.3d at 178 n. 2 (explaining that the Court's conclusion that the chal-

lenged statute was facially content-neutral "also serves to defeat the plaintiffs' equal protection" claim); *McGuire I*, 260 F.3d at 49 (citing *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), for the proposition that "the equal protection interests involved in the differential treatment of speech are inextricably intertwined with First Amendment concerns").

Supreme Court precedent supports this view. Where the Court has applied strict scrutiny to time, place, and manner regulations under the Equal Protection Clause, the restrictions were content-based. *See, e.g., Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (invalidating statute that generally prohibited picketing of residences or dwellings but exempted peaceful picketing of employment sites involved in labor disputes); *Mosley*, 408 U.S. 92, 92 S.Ct. 2286 (invalidating ordinance that proscribed picketing near schools, with exemption for schools involved in a labor dispute). Conversely, the Court has applied a less demanding test to time, place, and manner regulations that were not justified in terms of content. *See, e.g., Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 71 n. 34, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (upholding a zoning ordinance regulating the location of adult movie theaters, noting that the ordinance's purpose was to mitigate the "secondary effects" of crime and urban "deterioration" rather than to "protect[ ] ... citizens from exposure to unwanted, 'offensive' speech").

Brown also challenges the Ordinance under the First Amendment's Free Exercise Clause, claiming that its restrictions impermissibly interfere with her religiously motivated efforts to dissuade women from undergoing abortions.[23] *See McTernan v. City of York,* 564 F.3d 636, 647 (3d Cir.2009) ("The Free Exercise Clause not only forbids regulation of religious beliefs as such but also protects religiously motivated expression." (citing *Employment Div., Dept. of Human Res. of Or. v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990))). "The Free Exercise Clause, however, does not afford absolute protection to religiously motivated expression." *Id.* As the Supreme Court has explained, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).[24] "A law is 'neutral' if it does not target religiously motivated conduct. . . ." *Blackhawk v. Pennsylvania,* 381 F.3d 202, 209 (3d Cir.2004). It is "generally applicable" if it extends to all conduct that undermines the purposes of the law and does not selectively burden religiously motivated conduct. *Combs v. Homer–Center Sch. Dist.,* 540 F.3d 231, 242 (3d Cir.2008) (per curiam) (citing *Blackhawk,* 381 F.3d at 209). Under the

Supreme Court's decision in *Smith,* a neutral, generally applicable law is subject only to rational-basis review, which "requires merely that the action be rationally related to a legitimate government objective." *Tenafly Eruv Ass'n v. Tenafly,* 309 F.3d 144, 165 n. 24 (3d Cir.2002).

The Pittsburgh Ordinance is a facially neutral law of general applicability. Its restrictions do not evince hostility to religion, nor do they selectively burden religious conduct. The Ordinance's limitations apply irrespective of whether the beliefs underpinning the regulated expression are religious or secular. Brown disputes this conclusion, but her argument again relies on the mistaken premise that the Ordinance applies only to the speech of pro-life protesters and "not to clinic workers' speech on the same topic." On its face, the Ordinance is content-neutral and restricts the advocacy of all persons within the delimited zones.[25] Accordingly, the Ordinance is subject only to rational-basis review. As noted in our *Ward* analysis, the regulation serves the significant and legitimate state interests of preserving access and preventing harassment, intimidation, and violence. It thus satisfies the rational-basis test prescribed by *Smith.*

Brown contends the Ordinance is invalid under Pennsylvania's Religious

---

**23.** We do not question the sincerity of Brown's religious convictions.

**24.** Relying on dicta in *Smith,* some litigants pressing Free Exercise claims have presented a "hybrid rights" theory, contending that even a neutral, generally applicable regulation is subject to strict scrutiny if it "incidentally burdens rights protected by 'the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech.' " *Tenafly Eruv Ass'n v. Tenafly,* 309 F.3d 144, 165 n. 26 (3d Cir.2002) (quoting *Smith,* 494 U.S. at 881, 110 S.Ct. 1595). Like

many of our sister courts of appeals, we have not endorsed this theory, *see McTernan,* 564 F.3d at 647 n. 5; *Combs v. Homer–Center Sch. Dist.,* 540 F.3d 231, 244–47 (3d Cir.2008) (per curiam), and Brown does not propound it here.

**25.** The free exercise analysis here addresses only the facial validity of the Ordinance. Brown's claim that the city's police officers have selectively enforced it only against pro-life protesters, and not clinic workers, is examined in Section II.B.2 below.

Freedom Protection Act (RFPA), 71 Pa. Stat. Ann. §§ 2401–2407. The RFPA was enacted in order to provide more protection to the exercise of religious beliefs than that currently afforded by the Free Exercise Clause of the First Amendment to the Federal Constitution. *See Combs*, 540 F.3d at 260–61 (Scirica, C.J., concurring) (discussing "the development of federal First Amendment jurisprudence and its influence on Pennsylvania law").[26] As noted, under the Supreme Court's holding in *Smith*, neutral, generally applicable laws burdening religion are subject only to rational-basis scrutiny under the Federal Constitution's Free Exercise Clause. The RFPA, by contrast, prohibits any law from "substantially burden[ing] a person's free exercise of religion," even if the "burden . . . results from a rule of general applicability," unless the law is the least restrictive means of furthering a compelling state interest. 71 Pa. Stat. Ann. § 2404.[27]

Significantly, not all burdens on the exercise of religion trigger the RFPA's heightened scrutiny. "In our modern regulatory state, virtually all legislation . . . imposes an incidental burden at some level by placing indirect costs on an individual's activity. . . . Pennsylvania . . . [has] identified a substantiality threshold as the tipping point for requiring heightened justifications for governmental action." *Combs*, 540 F.3d at 262 (Scirica, C.J., concurring). In addition, the RFPA requires "as a threshold matter" that persons invoking its protections "prove . . . that their free exercise of religion has or will likely be 'substantially burdened' " by "clear and convincing evidence"; only after that showing is made is the government obliged to demonstrate that the challenged law or activity is the least restrictive means of advancing a compelling interest. *Id.* at 253 (per curiam opinion); *see also id.* at 262 (Scirica, C.J., concurring) ("[B]y requiring proof of a 'substantial burden' by clear and convincing evidence, Pennsylvania appears to have set a higher threshold than other religious restoration statutes."); *Commonwealth v. Parente*, 956 A.2d 1065, 1074 n. 16 (Pa. Commw.Ct.2008) (noting that the Pennsylvania Supreme Court has stated that "[t]he standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue" (quoting *In re Sylvester*, 521 Pa. 300, 555 A.2d 1202, 1203–04 (1989))).

---

26. In 1993, Congress enacted the federal Religious Freedom Restoration Act (RFRA), 107 Stat. 1488, 42 U.S.C. §§ 2000bb to 2000bb–4 (amended 2000), which attempted to resurrect the compelling-interest test that had been applied to laws substantially burdening religious exercise before the Supreme Court's *Smith* decision. But in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court invalidated the statute as applied to the states, holding that it "exceeded the scope of Congress' enforcement power under section 5 of the Fourteenth Amendment," *Combs*, 540 F.3d at 261 (Scirica, C.J., concurring) (citing *Boerne*, 521 U.S. at 536, 117 S.Ct. 2157); *see also Boerne*, 521 U.S. at 534, 117 S.Ct. 2157 (finding that the RFRA "is a considerable congressional intrusion into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens"). In response, several states, including Pennsylvania, enacted their own statutes bolstering protection of religious freedom. *See Combs*, 540 F.3d at 261–62 & nn. 47 & 48.

27. There is no question that the RFPA applies to the Ordinance at issue here. *See* 71 Pa. Cons.Stat. Ann. § 2406(a) ("This act shall apply to any State or local ordinance and the implementation of that law or ordinance, whether statutory or otherwise and whether adopted or effective prior to or after the effective date of this act.").

According to the RFPA, a law "substantially burdens" religious exercise if it: "(1) Significantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs;" "(2) Significantly curtails a person's ability to express adherence to the person's religious faith;" "(3) Denies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion;" or "(4) Compels conduct or expression which violates a specific tenet of a person's religious faith." 71 Pa. Stat. Ann. § 2403. Brown argues that the Ordinance "substantially burdens" her religiously motivated advocacy activities under each of the first three definitions.[28]

In this case, the exercise of religion at issue—Brown's advocacy activities in front of the clinics—is also expression protected by the First Amendment. Brown essentially urges us to interpret the RFPA as carving out an exemption to the Ordinance for religiously motivated ideas: its restrictions would not apply to religiously motivated expression that would be "substantially burdened" by the Ordinance. As we seek to determine what constitutes a substantial burden in this context, we confront two possibilities. First, "substantially burden" might be defined such that the protection the RFPA affords to religious speech is coextensive with (or lesser than) that afforded to speech generally by the First Amendment. Under this definition, if a given burden on expression is permissible under the First Amendment, it would also be permissible under the RFPA. Second, "substantially burden" might be defined such that the RFPA would provide more protection to speech motivated by religious belief than the First Amendment

would provide to that same speech. Under this definition, for example, protesters inspired by non-religious beliefs could be restricted, consistent with the First Amendment, from approaching within eight feet of unwilling listeners in the bubble zone, but protesters motivated by religious beliefs might be exempt from that same restriction by virtue of the RFPA.

This second definition of "substantially burden" raises serious constitutional concerns because it would cause the applicability of the Ordinance to turn on whether a given advocacy activity was motivated by religious or non-religious beliefs. The exemption for religiously motivated expression would convert the Ordinance into precisely the kind of viewpoint-based restriction of speech that the Supreme Court has held presumptively invalid under the First Amendment. *See Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("The government must abstain from regulating speech when the specific motivating ideology . . . is the rationale for the restriction.").

In Pennsylvania law, as in federal law, it is a canon of statutory construction that "[w]hen the validity of an act of the (Legislature) is drawn in question, and if a serious doubt of constitutionality is raised, . . . [courts] will first ascertain whether a construction of the statute is fairly possible by which the (constitutional) question may be avoided." *Com., by Creamer v. Monumental Props., Inc.,* 459 Pa. 450, 329 A.2d 812, 827 (1974) (quoting *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)). This principle applies with equal

---

**28.** In *Commonwealth v. Parente,* 956 A.2d 1065 (Pa.Commw.Ct.2008), the Pennsylvania Commonwealth Court construed the third definition of "substantially burdens": "Denies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion." It appears that no court has yet construed either of the first two definitions.

force to the interpretation of municipal ordinances. *See Dole v. Philadelphia,* 337 Pa. 375, 11 A.2d 163, 168 (1940); *Kadash v. City of Williamsport,* 19 Pa.Cmwlth. 643, 340 A.2d 617, 621 (1975). In accordance with this precept, we construe the statutory scheme at issue here in a manner that preserves it from serious constitutional doubt: the Ordinance's restrictions do not "substantially burden" religiously motivated expression if they do not impose an impermissible burden under the Free Speech Clause of the First Amendment.

This construction of the RFPA finds support not only in the canon of constitutional avoidance, but also in the history of the Supreme Court's Free Exercise Clause jurisprudence. As noted, the purpose of the RFPA was to restore, under the auspices of state law, the free exercise jurisprudence that held sway under *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), before the Supreme Court decided *Employment Division v. Smith. See supra* note 26; Pa. Senate Journal, 2002 Reg. Sess. No. 67, at 2386 (Nov. 20, 2002) (statement of Sen. Jubelirer, co-sponsor of the RFPA); *id.* at 2386–87 (statement of Sen. Mellow, co-sponsor of the RFPA). In the *Sherbert* era, the Supreme Court confronted a free exercise challenge to a rule confining solicitation at state fairs to booths. *See Heffron,* 452 U.S. 640, 101 S.Ct. 2559; *cf. Navajo Nation v. U.S. Forest Serv.,* 535 F.3d 1058, 1074 (9th Cir.2008) (looking to *Sherbert*-era Supreme Court cases in interpreting the federal Religious Freedom Restoration Act). The Court held that the rule did not unconstitutionally restrict the plaintiff's right to freely exercise "one of its religious rituals, which enjoins its members to go into public places to . . . solicit donations for the support of the Krishna religion," because the rule was valid under the Court's test for time, place, and manner restrictions on expression. *Heffron,* 452 U.S. at 645, 101 S.Ct. 2559. *Heffron* suggests that where the religious exercise in question is also expression protected by the Free Speech Clause of the First Amendment, the protection afforded by the Free Exercise Clause—under the earlier "substantial burden" test of *Sherbert,* which the RFPA seeks to restore—is congruent with the protection provided by the Free Speech Clause. Indeed, this is precisely the gloss a concurring opinion gave to *Heffron* at the time:

> Our cases are clear that governmental regulations which interfere with the exercise of specific religious beliefs or principles should be scrutinized with particular care. *See, e.g., Sherbert v. Verner,* 374 U.S. 398, 402–03, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). . . . I read the Court as accepting these precedents, and . . . holding that even if Sankirtan [a Krishna ritual involving the distribution of literature and solicitation of funds] is 'conduct protected by the Free Exercise Clause,' it is entitled to no greater protection than other forms of expression protected by the First Amendment that are burdened to the same extent by [the law at issue].

*Id.* at 659 n. 3, 101 S.Ct. 2559 (Brennan, J., concurring in part and dissenting in part); *cf. Mahoney v. U.S. Marshals Serv.,* 454 F.Supp.2d 21, 38 (D.D.C.2006) (applying the federal Religious Freedom Restoration Act and holding that "even if the Court were to assume that plaintiffs were exercising their religion by demonstrating in front of the Mass, there would . . . be no substantial burden on this exercise[ ] for the same reasons . . . the time, place, and manner restrictions in this case were reasonable").

Accordingly, we find that the RFPA confers on religiously motivated expression the same extent of protection provided by the First Amendment to expression gener-

ally. Since we have already determined that the bubble and buffer zones, taken individually and on their face, survive First Amendment scrutiny, we also find that their restrictions may be applied to Brown's advocacy activities without "substantially burdening" her exercise of religion under the RFPA.

### 3.

Brown's other claims, then, do not require us to modify our determination under the First Amendment: in tandem the buffer and bubble zones are inadequately tailored, but either of them individually would be facially valid. As this is an interlocutory appeal from the denial of a preliminary injunction, our review would normally be limited to deciding whether such an injunction should issue. But "the Supreme Court has held the 'general rule' of limited review is one of 'orderly judicial administration, not a limit on judicial power.'" *OFC Comm Baseball v. Markell,* 579 F.3d 293, 299 (3d Cir.2009) (quoting *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists,* 476 U.S. 747, 757, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), *overruled on other grounds by Planned Parenthood of Se. Penn. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). "If a preliminary injunction appeal presents a question of law 'and the facts are established or of no controlling relevance,' the panel may decide the merits of the claim." *Pitt News v. Pappert,* 379 F.3d 96, 105 (3d Cir.2004) (quoting *Thornburgh,* 476 U.S. at 756–57, 106 S.Ct. 2169); *accord Markell,* 579 F.3d at 298–99; *see Cavel Intern., Inc. v. Madigan,* 500 F.3d 551, 559 (7th Cir.2007) (awarding judgment on the merits because, "[a]lthough the appeal is from the denial of a preliminary injunction, the merits of [plaintiff's] challenge to the horse-meat law have been fully briefed and argued and there are no unresolved factual issues the

resolution of which in a trial would alter the result"); *Solantic, LLC v. City of Neptune Beach,* 410 F.3d 1250, 1274 (11th Cir.2005) ("[W]e do not think it necessary or prudent to confine our opinion to holding that [the plaintiff] has shown a *likelihood* of success on the merits, when it is altogether clear that [the plaintiff] *will* succeed on the merits of its First Amendment claims.").

A decision on the merits is appropriate here, as the issue of the Ordinance's facial validity has been fully briefed and argued, and the relevant facts—which, in the context of a facial challenge, do not encompass the features of particular clinic sites or specific incidents of enforcement—are undisputed. The dispositive question—whether, on these undisputed facts, the Ordinance is a content-neutral time, place, and manner regulation that is narrowly tailored to significant government interests and leaves open ample alternative channels of communication-is one of law. Because we find that the Ordinance's combination of zones is not narrowly tailored, we hold on the merits that the Ordinance is facially invalid.

This conclusion, however, does not end the matter. The Ordinance has an express severability provision. Pittsburgh, Pa., Code tit. 6, § 623.06 ("If any portion of this Chapter is held invalid, unenforceable, or unconstitutional by any court of competent jurisdiction, it shall not affect the validity of the remaining portions of this Chapter, which shall be given full force and effect."). The question, therefore, is which zone shall be invalidated and which shall be left in effect. Because either zone individually is lawful, the decision of which zone to employ belongs not to us but rather to the City. On remand, therefore, the City should inform the District Court of its

preference, and the court should enjoin enforcement of the other zone.[29]

### B.

Even to the extent that the Ordinance is facially valid, it may be unlawful as applied. Brown brings two types of as-applied challenges against the Ordinance. First, she argues that facts specific to the clinic sites at which she protests—the number of other businesses falling within the restrictive zones, the ambient noise levels, the width of the sidewalks, etc.—render the application of the Ordinance at those locations invalid under the Free Speech Clause of the First Amendment. Second, she contends that even if the Ordinance is content-neutral on its face, it has been selectively enforced by the Pittsburgh police, who have allegedly applied it only to persons, such as Brown, expressing pro-life views, and not to clinic workers and volunteers advocating pro-choice positions.

### 1.

In upholding the Colorado statute against a facial challenge, the *Hill* Court suggested that the result of as-applied challenges to the statute could depend on facts unique to the particular locations at which the statute's restrictions were enforced. *See Hill*, 530 U.S. at 730, 120 S.Ct. 2480 ("Special problems that may arise where clinics have particularly wide entrances or are situated within multipurpose office buildings may be worked out as the statute is applied."); *see also id.* at 738–39, 120 S.Ct. 2480 (Souter, J., concurring) (Although the statute "could possibly be applied to speakers ... who might try to engage ... people having no business

with the facility," this objection does not "weigh heavily on a facial challenge" because "I am skeptical about the number of health care facilities with substantial pedestrian traffic within 100 feet of their doors but unrelated to the business conducted inside."); *id.* at 740, 120 S.Ct. 2480 ("Whether floating bubble zones are so inherently difficult to administer that only fixed, no-speech zones (or prohibitions on ambulatory counseling within a fixed zone) should pass muster is an issue neither before us nor well-suited to consideration on a facial challenge."); *cf. id.* at 738, 120 S.Ct. 2480 (Under the statute, "[t]he content of the [speaker's] message will survive on any sign readable at eight feet and in any statement audible from that slight distance."). Accepting *Hill's* invitation, Brown argues that the Ordinance is substantially overbroad because, given the large number of non-health care facilities that fall within the one-hundred-foot zone around the clinics at issue here, the vast majority of the persons whom the Ordinance hinders protesters from engaging are not patients and have no business with the clinics; that the noise levels at the clinics make it extremely difficult, if not impossible, for Brown to make herself heard from eight feet away; and that the width of the sidewalk and other physical impediments make it extremely difficult, if not impossible, for Brown to engage people in conversation at the prescribed distance of eight feet without venturing into the street or otherwise putting her safety at risk.[30]

Although the District Court acknowledged these arguments, it apparently found them unpersuasive. Brown com-

---

29. Of course, nothing we have said prohibits the City from enacting a different regulatory scheme consistent with the constitutional restrictions we have delineated in this opinion.

30. Because the City may prefer the bubble to the buffer zone, *see supra* note 28, we consider Brown's as-applied challenge to the former.

plains that this aspect of the court's decision was tainted by the court's unannounced visit to, and inspection of, the Pittsburgh clinic sites, undertaken after the close of evidence and outside of the presence of the parties or the court reporter.[31] The City argues that it is "proper and appropriate for a Judge to take such a view pursuant to the Court's inherent power to observe places or objects that are material to litigation but which cannot feasibly be brought or satisfactorily reproduced within the courtroom." 2 McCormick on Evidence § 219 (6th ed.).

■■■ We believe the District Court's site visits were improper. The problem is not that the court viewed locations outside of the courtroom. Rather, it is that the court did so outside the record and without notice to the parties. *See* 2 McCormick on Evidence § 219 ("The judge in a bench trial may take a view [of a place or object outside the courtroom], though to do so without allowing the parties to attend invites a claim of error."). "[B]ecause counsel were not informed when the judge would be conducting h[er] inspection, the parties had no way of knowing exactly what the court looked at, or how the judge went about h[er] visit." *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1267 (9th Cir.2001). "Without presence of counsel there is no way to be certain ... that the court does not view the wrong premises or objects.... [Furthermore, w]hen there is an improper view the parties have no opportunity to cross-examine,

to object to the introduction of the evidence, or to rebut the evidence." *Lillie v. United States*, 953 F.2d 1188, 1191 (10th Cir.1992). In addition, "because there is no record of the view, the litigants may effectively be denied any means of challenge on appeal." *Id.; see also Sixshooters*, 251 F.3d at 1267 ("All of this is another way of saying that the record on appeal is incomplete.").

The City contends that any error in the site views was harmless.[32] We cannot agree. "Erroneous admission of evidence is harmless only if other competent evidence is 'sufficiently strong' to permit the conclusion that the improper evidence had no effect on the decision." *Lillie*, 953 F.2d at 1192; *accord Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 251 (3d Cir.2008) ("An erroneous evidentiary ruling will be considered harmless if it is highly probable that the district court's [ruling] did not affect [the party's] substantial rights." (alterations in original and internal quotation marks omitted)). Here, although the District Court does not appear to have made explicit factual findings regarding noise levels, pedestrian traffic in the zones, or the effect of particular site features on Brown's activities, it is hard to imagine the District Court's visits did not play a role in its rejection of Brown's arguments. In fact, the City lends support to this conclusion when it contends that "[t]he District Court found that the noise levels did not impede Brown's ability to communicate under the Ordinance after careful examination of both testimony of

**31.** The District Court explained, "The Plaintiff has provided the Court with exhibits in support of her motion for a preliminary injunction which display the facilities at issue and the surrounding zones. However, since those photographs were taken in 2006, the areas have changed. Therefore, the Court has taken a view of these areas pursuant to its inherent power to 'observe places or objects that are material to litigation but which cannot

feasibly be brought, or satisfactorily reproduced, within the courtroom.'" *Brown*, 543 F.Supp.2d at 455 n. 8 (quoting 2 McCormick on Evidence § 219 (6th ed.)); *see also id.* at 456 n. 9, 458 n. 13, 463 n. 16, 464 n. 18, 465 n. 20 (referring to site visits).

**32.** Brown does not dispute that the improper visit is subject to a harmless error standard.

the parties and the District Court's own site visits to the various medical facilities in question." Because we cannot say with confidence that the able District Court's site visits did not influence its finding that the Ordinance-as applied to the particular clinic locations where Brown protests-was not overbroad and did not excessively burden Brown's speech rights under *Ward,* we will vacate the District Court's ruling on this aspect of the as-applied challenge. On remand, the District Court should allow the parties a chance to attend site visits and give them a chance to respond, on the record, to proposed factual findings drawn from the visits.[33]

Brown also complains that the District Court considered other evidence to which she did not have a chance to respond, such as newspaper articles reporting crime levels and transit cutbacks, *see Brown,* 543 F.Supp.2d at 462 n. 15, 463 n. 17, and an internet website displaying crime statis-

tics, *see id.* at 455 n. 8. She contends this material was not appropriate for judicial notice and was inadmissible hearsay. In response, the City points out that evidentiary rules are relaxed in a preliminary injunction proceeding, and that "the trial court should be allowed to give even inadmissible evidence some weight when it is thought advisable to do so in order to serve the primary purpose of preventing irreparable harm before a trial can be held." 11 Wright & Miller, *Federal Practice & Procedure* § 2949, at 471. We do not dispute this general principle, but as with the site visits, our view is that the parties apparently had no notice that the District Court was considering the material to which Brown objects; accordingly, the parties had no opportunity to rebut this evidence or place it into context. Our remand will allow Brown to respond to this material and to make objections to its admissibility.[34]

---

33. Our remand will also allow the District Court to make explicit findings as to noise levels and other environmental conditions and to clarify the effect of these conditions on the merits of Brown's claim.

34. In addition to the as-applied claims raised by Brown, Amicus National Legal Foundation argues that the Ordinance is unconstitutionally vague as applied because it is unclear what constitutes "consent" under the bubble-zone regulation. *See* Pittsburgh, Pa., Code tit. 6, § 623.03 ("No person shall knowingly approach another person within eight feet (8') of such person, unless such other person consents...."). Brown raised this argument before the District Court but omitted it on appeal. Although "we need not necessarily reach issues advanced only by amici," *In re Paoli R.R. Yard PCB Litig.,* 221 F.3d 449, 465 n. 6 (3d Cir.2000), we will briefly address this contention.

As Amicus acknowledges, the Supreme Court in *Hill* rejected a facial vagueness challenge to an identical statutory "consent" provision. *See Hill,* 530 U.S. at 732–33, 120 S.Ct. 2480. Despite petitioners' "hypertech-

nical theories as to what the statute covers, such as whether an outstretched arm constitutes 'approaching,' " the Court "conclude[d] that it is clear what the ordinance as a whole prohibits." *Id.* at 733, 120 S.Ct. 2480 (internal quotation marks omitted). "[S]peculation about possible vagueness in hypothetical situations," the Court emphasized, "will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Id.* (internal quotation marks omitted).

Although Amicus characterizes its vagueness claim as an as-applied challenge, it is essentially the same kind of facial attack rebuffed by *Hill.* Amicus does not cite any occasion on which the Ordinance was enforced against Brown on the ground that she had failed to obtain consent from a person she approached. *Cf. Coates v. City of Cincinnati,* 402 U.S. 611, 620–21, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (White, J., dissenting) ("[S]ince we have no information from this record as to what conduct was charged against these defendants, we are in no position to judge the statute as applied."). Instead, Amicus focuses on the alleged ambiguity inherent in the terms of the statute itself.

## 2.

Brown's second type of as-applied challenge argues that the Pittsburgh police have discriminated on the basis of viewpoint in enforcing the statute, applying its restrictions only to pro-life protesters like Brown and not to clinic workers and volunteers. As the City observes, because the Ordinance on its face does not discriminate based on content or viewpoint, Brown can prevail only if she establishes a pattern of discriminatory enforcement evincing an intent to target particular viewpoints. Under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694, 98 S.Ct. 2018.[35] In other words, plaintiffs may not rely on a theory of respondeat superior to impose liability on municipalities. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.*

■ Brown contends that "the Ordinance itself" is the "policy" giving rise to municipal liability, and that "[w]hen 'challenging the constitutionality of a policy …' a plaintiff is not required to 'allege a sequence of constitutional deprivations; the claim that the policy resulted in the plaintiff suffering such a deprivation satisfies *Monell*.'" *Doby v. DeCrescenzo*, 171 F.3d 858, 868 (3d Cir.1999). The principle Brown cites is a correct statement of the law, but it is not applicable here because Brown's premise is faulty—the Ordinance itself is not an unconstitutional policy. As the Supreme Court has explained, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing … municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion). The rationale for this rule is straightforward. "[A] single incident of police misbehavior by a single policeman is insufficient as *sole* support for an inference that a municipal policy or custom caused the incident." *Id.* at 832, 105 S.Ct. 2427 (Brennan, J., concurring); *see id.* at 822–24, 105 S.Ct. 2427 (plurality opinion) (contrasting the facially unconstitutional, explicit policy at issue in *Monell*, only one application of which was sufficient to trigger municipal liability, to fact patterns that present no such explicit policy, where "more proof

*See, e.g.,* Amicus Br. 5 ("[T]he term 'consent' in Pittsburgh's ordinance is an undefined condition that lacks the clarity … required for Ms. Brown … to know what she must do to attain this 'consent' from a patient going to the clinic."); *id.* at 10 (complaining of the Ordinance's "lack of definitional clarity"). Amicus also poses the sort of hypothetical questions turned aside by *Hill. See, e.g., id.* at 5 ("If there are several people in a group, must [Brown] gain consent from all of them or just the person she is seeking to speak to?"). We fail to see how the questions Amicus asks about the Ordinance are meaningfully different from the ones raised by the *Hill* petitioners—who, like Brown, pondered the meaning of the consent requirement in the context of their pro-life clinic advocacy.

Moreover, as in *Hill*, any vagueness concern "is ameliorated by the fact that" the Ordinance "contains a scienter requirement." *Hill*, 530 U.S. at 732, 120 S.Ct. 2480. If Brown believes that a person within the bubble zone has consented to her approach—however that perceived consent was manifested—then the Ordinance's "knowingly" requirement protects her from liability.

**35.** Brown's Complaint does not name as defendants any of the police officers allegedly involved in selective enforcement of the Ordinance.

than the single incident will be necessary" to establish a causal connection between the incident and some municipal policy)[36]; *see also Monell,* 436 U.S. at 691, 98 S.Ct. 2018 (explaining that municipal liability can exist even when "discriminatory practices" are "not authorized by written law," but only if such practices are sufficiently "permanent and well settled as to constitute a 'custom or usage' with the force of law" (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970))). More recently, the Supreme Court has confirmed this jurisprudence, stating that "in order to win a viewpoint discriminatory enforcement challenge against a law that is facially neutral, the challenger would need to show 'a pattern of unlawful favoritism.' " *McGuire II,* 386 F.3d at 64 (quoting *Thomas v. Chi. Park Dist.,* 534 U.S. 316, 325, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002)). As we have already determined in our analysis of Brown's facial challenge, the Ordinance itself is a time, place, and manner regulation that does not discriminate unlawfully on the basis of content or viewpoint. Accordingly, to prevail against the City on her

discriminatory enforcement claim, Brown must demonstrate "a pattern of unlawful favoritism." [37]

■ Furthermore, in order to show such a pattern, Brown must prove not merely that the weight of Pittsburgh's enforcement of the Ordinance has tended to fall more heavily on those who advocate one viewpoint (e.g., a pro-life view) than on those who advocate another (e.g., a pro-choice view); Brown must also prove that such enforcement occurred *because of* the viewpoint expressed. That is, Brown must show an intent to discriminate on the basis of viewpoint. *See McGuire II,* 386 F.3d at 63. This requirement follows from *Ward's* statement that "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746. If advocates of a particular viewpoint happen to engage in certain proscribed conduct more than those who espouse other views, then the law restricting that conduct will have the effect of discriminating between different

---

**36.** Justice Brennan did not join the plurality opinion in *Tuttle* because he found it "needlessly complicate[d]." *Tuttle,* 471 U.S. at 825, 105 S.Ct. 2427 (Brennan, J., concurring). In *Tuttle,* the plaintiff argued that her husband had been shot by police officers due to a "policy" of inadequate training. The plurality doubted that a "policy of 'inadequate training' " was itself unconstitutional, and thus expressed skepticism about whether *Monell* liability could be predicated on such a "policy," even assuming it could be shown to have caused the unconstitutional police conduct, *id.* at 822–23, 105 S.Ct. 2427 (plurality opinion). Justice Brennan, by contrast, thought the specific nature of the underlying policy was unimportant, as long as there was such a policy and it was the cause of the unconstitutional action: "If a municipality takes actions—whether they be of the type alleged in *Monell* . . . or this case—that cause the deprivation of a citizen's constitutional rights, § 1983 is available as a remedy." *Id.* at 833

n. 8, 105 S.Ct. 2427 (Brennan, J., concurring). The difference between the two opinions, however, is not relevant here. Both opinions (and thus a majority of the Court) agreed that a single incident of unconstitutional police conduct, standing alone, was insufficient to establish municipal liability because it could not support an inference that there existed a city policy that was the cause of the incident.

**37.** Demonstration of a "pattern" of selective enforcement may not be necessary in cases where there is direct evidence of an explicit policy to implement a facially neutral law in an unconstitutionally discriminatory way. But where a plaintiff relies primarily on incidents of discriminatory enforcement as circumstantial evidence of a municipal policy or custom, proof of a pattern is required, as *Tuttle* makes clear.

viewpoints. But a differential effect is, in itself, no constitutional vice, as long as the purpose of the law is viewpoint-neutral. *See Madsen,* 512 U.S. at 763, 114 S.Ct. 2516 ("That petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order. It suggests only that those in the group *whose conduct* violated the court's order happen to share the same opinion regarding abortions being performed at the clinic.").

■ If a law is not unconstitutionally viewpoint- or content-based on its face simply because it is especially likely to affect advocates of a particular viewpoint, then the acts of police officers enforcing the law cannot be unconstitutionally viewpoint- or content-based simply because they primarily affect exponents of that view. On the as-applied level, too, differential impact alone is not sufficient evidence of unconstitutional viewpoint discrimination. "If we require invidious *legislative* intent to make this kind of otherwise content-neutral statute content or viewpoint discriminatory, then there seems no reason why we should not require invidious intent by the enforcers to take this statute outside of the category of content-neutrality now." *McGuire II,* 386 F.3d at 63. Indeed, to hold otherwise would create an anomaly in which faithful enforcement of a regulation whose burdens fall incidentally on a particular viewpoint would be unconstitutionally discriminatory, even though the regulation itself was valid on its face.

■ Our analysis yields the following conclusion: in order to establish municipal liability for selective enforcement of a facially viewpoint- and content-neutral regulation, a plaintiff whose evidence consists solely of the incidents of enforcement themselves must establish a pattern of enforcement activity evincing a governmental policy or custom of intentional discrimination on the basis of viewpoint or content.[38]

■ Brown testified about two encounters she had with Pittsburgh police officers. On January 28, 2006, Officer Timothy Alexander arrived at the Planned Parenthood Clinic downtown and observed several protesters within the fifteen-foot buffer zone; the protesters dispersed upon his arrival. A security guard at the clinic pointed Brown out to Officer Alexander. When Officer Alexander approached Brown, she asked him to clarify the Ordinance's terms. According to Brown's testimony, the officer said she "could not stand and do anything within the fifteen foot spot in front of the clinic," and that "he didn't want to see [Brown] chasing women down the street." Brown testified that there is a pornography shop located within the one-hundred-foot bubble zone in front of the Planned Parenthood Clinic. As Brown recalled matters, she showed Officer Alexander some anti-pornography literature she was carrying and asked him if she could distribute it in front of the pornography store. In Brown's words, he replied that he "didn't care what [Brown] did in front of the porn shop, as long as [she] wasn't in front of the clinic."

---

**38.** The District Court formulated the legal standard correctly: "In order to prevail, Brown must show that the Defendant City caused the alleged constitutional violation of which she complains through a municipal custom, practice, or policy. Additionally, in order to succeed on an as-applied First Amendment viewpoint discrimination claim, some showing of intent on the part of the government is necessary." *Brown,* 543 F.Supp.2d at 486 (internal citation omitted).

Officer Alexander's account of this encounter was somewhat different. He testified that he believed that the protesters at the clinic (he did not recall speaking specifically with Brown) showed him two different types of pamphlets and asked him if they could pass out either one, but that he did not pay attention to the content of the pamphlets. "I was not there ... to find out what the content of this information was," he stated, "but only to let [the protesters] know that whatever they did they had to follow the [Ordinance's] rules." Officer Alexander further explained that "it is common practice in the [police] department that an officer would have to personally witness a violation before he would enforce an ordinance." *Brown*, 543 F.Supp.2d at 459.

Brown's second encounter with a police officer occurred in September 2006. Brown testified that, while standing outside of the fifteen-foot buffer zone in front of a clinic in the East Liberty neighborhood of Pittsburgh, she had tried to speak with a woman and hand her a piece of literature, at which point a clinic worker standing inside the buffer zone had hit Brown's hand away and yelled at her to back up. Brown had walked over to a police car nearby and told an unidentified officer what had happened, but she testified that "he told me that he could not do anything about it because he had not seen the incident. I explained to him, he had ... to see the incident. He said it didn't matter. He hadn't seen it. He couldn't do anything about it." Brown recounted that the officer did, however, "tell me that if he saw me again going up behind women walking down the street, that he would arrest me."

In her testimony, Brown recalled other incidents in which private citizens, usually clinic employees or volunteers, allegedly violated the Ordinance by confronting Brown, denouncing her views, and interfering with her attempts to communicate with consenting women—all within the Ordinance's regulated zones. The District Court found, however, that "the police have not witnessed these events nor were they called to the scene." *Brown*, 543 F.Supp.2d at 461.

We agree with the District Court that "[t]his evidence does not amount to a 'pattern of unlawful favoritism'" in the City's enforcement of the Ordinance. *Id.* at 486. First, "[t]o the extent that [Brown is] claiming that the statute is unconstitutional as applied merely because private pro-choice persons are engaging in acts that are illegal under the statute, [her] claim has nothing to do with the [Ordinance] at all and [she] cannot bring it because there is no state action." *McGuire II*, 386 F.3d at 60. Accordingly, Brown's "evidence of private activity must be linked to the state's enforcement efforts somehow." *Id.* (citing *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 622–24, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–42, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Flagg Bros. v. Brooks*, 436 U.S. 149, 164–66, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)).

Brown's two encounters with police satisfy the state-action requirement, but they do not manifest discriminatory enforcement of the Ordinance, let alone discriminatory enforcement attributable to a municipal policy or custom. Officer Alexander explicitly testified that he did not care about the content of the literature distributed by protesters; regardless of subject matter or viewpoint, any advocacy activity within the prescribed zones had to conform to the Ordinance's restrictions. Even if we relied solely on Brown's account of this encounter, we would still find no evidence of content-based enforce-

ment.[39] Brown stated that Officer Alexander said she could distribute literature in front of the pornography shop, which is within the one-hundred-foot bubble zone, but the Ordinance allows for the distribution of any kind of literature in that zone, as long as purveyors do not approach within eight feet of unwilling passersby. It is only within the fifteen-foot buffer zone immediately in front of clinic entrances that the distribution of literature is absolutely prohibited. Even on Brown's own account, then, the evidence does not show that Officer Alexander made a distinction on the basis of the content of the message. It shows only that he distinguished, appropriately, between the locations at which the leafletting occurred.

The September 2006 incident also fails to display an intent to discriminate on the basis of content or viewpoint. Although Brown claims that a clinic escort within the buffer zone violated the Ordinance by yelling at her to back up and hitting her hand away,[40] the unidentified officer to whom she reported this event replied that he did not see it. But even if he had seen the escort's conduct, and even if we assume—in the absence of any record evidence—that the officer failed to enforce the Ordinance against the escort because of the escort's viewpoint, Brown would still need to show that the officer's inaction was the product of an unlawfully discriminatory governmental policy or custom. Here, the evidence before the District Court fell well short of that mark. As noted, one enforcement incident cannot meet the burden of proof imposed by *Monell.* And even if we assess the encounter with Officer Alexander in the light most favorable to Brown, we find no basis for inferring that the City has a policy or custom of enforcing the Ordinance based on the content of the speech or the viewpoint of the speaker. On the record before us, Brown has failed to substantiate her claim of unlawfully discriminatory enforcement.[41]

---

**39.** Brown testified that she asked Officer Alexander "what [she] was able to do" within the restrictions of the Ordinance "because [she] didn't want to get in any trouble." According to Brown,

Multiple times [Officer Alexander] enforced the ordinance against me. He told me I could not stand and do anything within the fifteen foot spot in front of the clinic, that I must always obey a uniformed officer, including the security guard. That he didn't want to see me chasing women down the street. That I could do anything I wanted to do in front of the pornography shop, because I showed him the literature I was passing out, both the abortion-related and the pornography-related. He told me he didn't care what I did down in front of the porn shop, as long as I wasn't in front of the clinic.

**40.** We assume, without deciding, that this conduct by the clinic escort violated the Ordinance. *But cf. McGuire II,* 386 F.3d at 64 (considering evidence "that some escorts tell patients that they do not have to listen to the [protesters] ... that some escorts have tried to drown out the words of the plaintiffs ... [and] that some escorts have taken anti-abortion leaflets out of the hands of patients," but concluding that "[t]here is no evidence that patients did not consent to almost all of the takings of these leaflets" and that "[n]one of these three kinds of acts is self-evidently a violation of the statute as interpreted by the Attorney General").

**41.** Although we adjudicated the merits of Brown's facial challenge, we do not do so with respect to her selective enforcement claim. Because a district court's factfinding in a preliminary injunction proceeding does not preclude further factual development during subsequent proceedings on the merits, because Brown's selective enforcement claim is more fact-intensive than her facial challenge, and because of the special solicitude courts show to First Amendment interests, we believe Brown is entitled to a further opportunity to develop the factual basis of her claim. *See St. Thomas–St. John Hotel & Tourism Ass'n, Inc. v. Gov't of the U.S. Virgin Islands,* 357 F.3d 297, 301 (3d Cir.2004) (noting that

**3.**

To establish entitlement to a preliminary injunction,

> the moving party must demonstrate that each of the following factors favors the requested relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,* 511 F.3d 350, 356–57 (3d Cir.2007). Because we have determined that Brown has not demonstrated a likelihood of success with respect to her claim of selective enforcement, we will affirm that aspect of the District Court's order. For the reasons given above, however, we will vacate the denial of the preliminary injunction with respect to Brown's claim that the Ordinance is unconstitutional as applied to specific clinic sites.

## III.

In addition to appealing the District Court's denial of preliminary injunctive relief, Brown also appeals from the court's order dismissing several of her claims. Specifically, the court dismissed Brown's freedom of the press and due process claims under the Federal Constitution, as well as her claims under the Pennsylvania Constitution, and her claim under the Pennsylvania Religious Freedom Protection Act.[42] The City did not seek dismissal of Brown's claims under the Freedom of Speech Clause, Free Exercise Clause, or Equal Protection Clause of the Federal Constitution, and the District Court's opinion therefore left these claims undisturbed. The District Court's decision to partially dismiss Brown's Complaint was based entirely on the analysis in its preliminary injunction opinion. Brown contends this was error because the standard for deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is different from the standard for deciding a motion for preliminary injunctive relief.

 Ordinarily, we do not have appellate jurisdiction over an order dismissing only some of the claims in a case because 28 U.S.C. § 1291's rule of finality requires that a district court judgment be "final as to all claims" in order to be appealable. *Mellon Bank, N.A. v. Metro Commc'ns, Inc.,* 945 F.2d 635, 640 (3d Cir.1991) (citing *Andrews v. United States,* 373 U.S. 334, 340, 83 S.Ct. 1236, 10 L.Ed.2d 383 (1963)).[43] Brown, however, argues that our review of the dismissal order is au-

---

because "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits," the standard rule is that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits") (quoting *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)); *Griffin v. Box,* 910 F.2d 255, 263 (5th Cir.1990) (stating that an appellate opinion "which only disposes of the issues on [a] temporary or preliminary injunction[ ] is not intended to foretell the district court's final determination after a full ventilation of the facts").

**42.** The District Court denied the City's motion to dismiss insofar as it sought the dismissal of Mayor Luke Ravenstahl and the Pittsburgh City Council as parties. This aspect of the District Court's order is not before us.

**43.** Under Federal Rule of Civil Procedure 54(b), a district court "may direct entry of a final judgment as to one or more, but fewer than all, claims" and thus convert a partial dismissal into an appealable final order, but the District Court here did not do so.

thorized by the doctrine of pendent appellate jurisdiction. This doctrine, "in its broadest formulation, allows an appellate court in its discretion to exercise jurisdiction over issues that are not independently appealable but that are intertwined with issues over which the appellate court properly and independently exercises its jurisdiction." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 202–03 (3d Cir.2001). The Supreme Court has admonished courts to construe the doctrine narrowly, but it has not defined the contours of pendent appellate jurisdiction with precision. *See Swint v. Chambers County Comm'n,* 514 U.S. 35, 43–51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). "[W]e have defined pendent appellate jurisdiction to mirror the Supreme Court's two examples: inextricably intertwined orders or review of the non-appealable order where it is necessary to ensure meaningful review of the appealable order." *E.I. DuPont,* 269 F.3d at 203.

Here, it is not the case that review of the non-appealable partial dismissal order is necessary to ensure meaningful review of the appealable order denying a preliminary injunction. Rather, the converse is true—because the District Court rested its analysis of the motion to dismiss on its preliminary injunction opinion, meaningful review of the non-appealable order necessitates review of the appealable order. Accordingly, if pendent appellate jurisdiction exists, it must be because the two orders are "inextricably intertwined."

Whether the two orders are "inextricably intertwined" is a difficult question, but we need not resolve it. Assuming arguendo that we can exercise pendent appellate jurisdiction over the partial dismissal order, we decline to do so here. *See Am. Soc'y for Testing & Materials v. Corrpro Cos.,* 478 F.3d 557, 580 (3d Cir.2007) (not-

ing that exercise of pendent appellate jurisdiction is "discretionary"); *McMahon v. Presidential Airways, Inc.,* 502 F.3d 1331, 1357 (11th Cir.2007) (stating that "[e]ven if the order [in question] is inextricably intertwined [with an issue properly before the court on interlocutory appeal], we have discretion to deny an appeal that has no other jurisdictional basis"); *Brotherton v. Cleveland,* 173 F.3d 552, 568 (6th Cir.1999) ("[W]e decline to exercise whatever discretionary pendent appellate jurisdiction we may have."). We see no compelling reason to review the partial dismissal at this time, especially since it did not dispose of Brown's primary claim under the Free Speech Clause of the First Amendment. Of course, because the District Court has not yet entered a final judgment, it is free to reconsider its dismissal order during subsequent proceedings, whether based on the reasoning in this opinion or on any other argument Brown may offer. *See* Fed.R.Civ.P. 54(b) (explaining that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties ... may be revised at any time before the entry of a [final] judgment").

## IV.

For the foregoing reasons, we will reverse the denial of preliminary injunctive relief with respect to Brown's facial challenge. Reaching the merits, we hold that the combination of the Ordinance's buffer and bubble zones is invalid but that either zone, individually, is valid on its face. We will affirm the District Court's denial of preliminary injunctive relief with respect to Brown's claim of selective enforcement, and vacate it with respect to her claim that the Ordinance is unconstitutional as applied to particular clinic locations. We will dismiss Brown's appeal from the District

Court's order partially dismissing her Complaint. And we will remand for appropriate further proceedings.